## SMITH v. UNITED STATES (two cases).

### THOMPSON v. SAME.

(Circuit Court of Appeals, Eighth Circuit. June 28, 1920.)

Nos. 5245, 5246, 5380.

1. **Criminal law ⬲1048—Exceptions necessary for appeal.**

   While under rule 11 of the Circuit Court of Appeals (188 Fed. ix, 109 C. C. A. ix) the court may notice a plain error not assigned nor excepted to, it is only in a clear case, to prevent a miscarriage of justice, that it will consider an alleged error not called to the attention of and not passed on by the trial court, and if it appears from the entire record that the accused is clearly guilty, errors not excepted to will afford no ground for reversal.

2. **Post office ⬲48(4)—Indictment for using mails to defraud need not charge that scheme was intended to be so effected.**

   Under Criminal Code, § 215 (Comp. St. § 10385), an indictment for using the mails to defraud need not charge that the scheme to defraud devised by defendants was intended to be effected by the use of the mails; but it is sufficient to allege that they were used for the purpose of executing such scheme.

3. **Criminal law ⬲427(3)—Order of proof as to conspirator's acts discretionary.**

   On trial of numerous defendants for conspiracy to use the mails to defraud, tentative admission of evidence of overt acts by some of the defendants in advance of proof connecting them with the conspiracy *held* within the discretion of the court.

4. **Conspiracy ⬲45—Wide latitude allowed in introduction of evidence.**

   In prosecutions for conspiracy, great latitude is allowed in the introduction of circumstantial evidence.

5. **Conspiracy ⬲32—To use mails to defraud held established.**

   A conviction of conspiracy to use the mails to defraud *held* sustained by evidence showing that defendants organized a corporation to raise and deal in live stock, purporting to have a capital of $200,000, but of which little or none was paid in by them, that they freely used the mails in advertising the ownership by such corporation of a large number of horses running on the range in Arizona, and sold and gave bills of sale for over 17,000 head, falsely representing them to be valuable animals and easy to capture, whereas they never owned to exceed 500 horses, which were small, wild broncos, of little value.

6. **Criminal law ⬲1186(4)—Conviction warranted on whole case reversed only for substantial error.**

   Where the guilt of a defendant is clearly established on the whole case, errors in the admission or exclusion of evidence must be substantial and clearly prejudicial, to warrant a reversal therefor.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Criminal prosecution by the United States against J. Sidney Smith, Charles M. Thompson, and C. A. Smith. Judgment of conviction, and defendants bring error. Affirmed.

John Lee Webster, of Omaha, Neb., for plaintiffs in error.

Howard Saxton, Sp. Asst. U. S. Atty., of Omaha, Neb. (T. S.

⬲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Allen, U. S. Atty., of Lincoln, Neb., on the brief), for the United States.

Before HOOK and CARLAND, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. The plaintiffs in error, referred to hereinafter as the defendants, prosecute these writs of error to secure a reversal of the conviction and sentences for violating section 37 of the Penal Code (Comp. St. § 10201), conspiring to violate section 215 of the Penal Code (section 10385). There were a large number of other persons charged as defendants in the indictment; some were dismissed, and a number of others were tried with the defendants and found guilty; but these three plaintiffs in error are the only defendants prosecuting writs of error. While a separate writ of error was secured by each of them, they were submitted on one record and argued as one cause; the evidence against all being practically the same.

The indictment contains only one count, and charges the defendants with conspiring in the county of Douglas, in the Omaha division of the district of Nebraska to violate section 215 of the Penal Code, in devising and intending to devise a scheme and artifice to defraud all such persons who could or might be induced by means of the fraudulent and false device, representations, pretenses, and promises, hereinafter mentioned, to become purchasers of horses from the U. S. Live Stock Company, a corporation organized under the laws of the state of Nebraska; that for the purpose of carrying the fraudulent scheme into effect they placed and caused to be placed in the post office of the United States at Omaha, Neb., and in divers other post offices of the United States, to be sent and delivered by the post office establishment of the United States, certain letters, writings, and advertisements in newspapers. It then describes the fraudulent scheme and artifice to have been that the conspirators organized and caused to be organized a corporation under the laws of the state of Nebraska, in the name of U. S. Live Stock Company, having its principal place of business at Omaha, in the state of Nebraska, with a pretended capital stock of $200,000, which they would fraudulently and falsely claim and represent to be of the value of $200,000; that the nature of the business to be transacted by said corporation would be to buy, sell, breed, and raise live stock of all kinds and descriptions, and engage in certain other businesses, not necessary to set out; that they then pretended to be the owners of large numbers of horses, located on a range in Coconino county, state of Arizona; that they would represent the horses were of a value of not less than $50 per head, averaging in weight from 900 to 1,200 pounds and upward; that said horses were in part Percheron, Hamiltonian, and Belgian breeds, and among them were a number of valuable stallions; that said horses were running wild upon the said range, but were easily accessible, and could be readily caught and reduced to possession at very little expense by purchasers; that they would make pretended

sales of said horses, in large numbers, to all such persons as might thereby be induced to purchase the same, and thereupon would execute a pretended bill of sale in the name of said corporation and in the names of some of the defendants, in which bill of sale the horses pretended to be sold would be described as from 2 to 3 and 6 to 8 years old, sound and free from blemish and disease, weighing from 900 pounds upwards, free from all incumbrances, on said range in Coconino county, Ariz., and to be gathered and loaded at the expense of the purchasers.

It is then charged that the capital stock of said corporation was of little or no value, and was not intended to be any part of the business to be transacted by it, as stated in the articles of incorporation; that neither of the defendants, nor the U. S. Live Stock Company, owned or possessed any considerable number of horses in said Coconino county, Ariz., nor elsewhere; that they owned less than 500 horses, which had been running wild upon said range for many years, were practically worthless, even if they could be secured, all of said horses being so wild and untamable as to render it impossible to secure them, and all of which were at the time incumbered for more than their value; that there were no horses of Percheron, Hamiltonian, or Belgian breeds, or any stallions of any appreciable value; that all of the representations made by them to purchasers were false, as they well knew, and were intended by the conspirators for the fraudulent purpose, to deceive intending purchasers, and defraud them of large sums of money and property of great value. It then charges 12 overt acts of the use of the mails, naming persons to whom the letters were sent through the mails, and advertisements in a number of newspapers published in a number of cities in different Western states, which were largely circulated through the mails.

A demurrer to the indictment was by the court overruled, and upon a trial to a jury a verdict of guilty was returned against these defendants and a number of others, who are not prosecuting writs of error.

[1] After the granting of the writs of error, the defendants applied to this court for leave to file additional assignments of error, which was denied. Notwithstanding this denial, counsel for defendants in their briefs and oral arguments relied almost entirely upon these assignments of error, which are no part of the record. This is not permissible. Kreuzer v. United States, 254 Fed. 34, 165 C. C. A. 444.

Under rule 11 (188 Fed. ix, 109 C. C. A. ix) the court, at its option, may notice a plain error not assigned. Nor will the court refuse to notice a substantial error committed during the trial, when the accused's liberty is involved, although no exceptions were taken, nor included in the assignment of errors. But it is only in a clear case, to prevent a miscarriage of justice, that an appellate court will consider an alleged error, not called to the attention of, and not passed on by, the trial court. Gillette v. United States, 236 Fed. 215, 149 C. C. A. 405. If it appears from the entire record that the accused is clearly guilty, errors not excepted to will afford no ground for reversal. It

was so held by this court in the late case. Williams v. U .S. (C. C. A.) 265 Fed. 625.

[2] The ground upon which counsel for defendant relied for the demurrer to the indictment was that it fails to charge that the scheme to defraud, devised by the defendants, was intended to be effected by the use of the post office establishment of the United States, although it charged that, for the purpose of executing it, newspapers and letters were placed and caused to be placed by them in the post office of the United States to be carried by the post office establishment to certain persons named in the indictment. While under section 5480, Rev. Stat., as amended in 1889, it was necessary to so charge, section 215 of the Penal Code, in force at the time the acts charged were committed, does not require it. It is sufficient if the fraudulent scheme and artifice has been devised and the mails of the United States are used for the purpose of carrying it into effect. United States v. Young, 232 U. S. 155, 34 Sup. Ct. 303, 58 L. Ed. 548; Stockton v. United States, 205 Fed. 462, 123 C. C. A. 530, 46 L. R. A. (N. S.) 936; United States v. Maxey (D. C.) 200 Fed. 997.

[3] It is next claimed that the court erred in permitting witnesses to testify as to overt acts of the defendants, or some of them, before the conspiracy had been established by proper evidence. But the court, in overruling the objections of the defendants to that testimony, admitted it only tentatively, saying:

"The only position the court can take at this time is to admit the testimony which appears to be relevant, and allow the defendants exceptions, and that our attention will be called to any link in the testimony, or any insufficiency in the connecting up of the links of the government's testimony. And it seems to me important that some record be kept by the counsel for defendants, and the court's attention called, if the testimony is not connected up."

In another instance the court, in overruling a similar objection, said, "I assume that the government will connect him up with the defendants;" to which the counsel for the government replied, "We will certainly do so;" and later did connect the defendant objecting with the other defendants. This was a matter of judicial discretion, with which appellate courts will not interfere. Kansas City Star v. Carlisle, 108 Fed. 344, 366, 47 C. C. A. 384; Spencer v. Read, 217 Fed. 508, 516, 133 C. C. A. 360, 368.

[4] In prosecutions of this nature, great latitude in the introduction of testimony is allowed, as in most instances the offense can only be established by circumstantial evidence. In Williamson v. United States, 207 U. S. 425, 451, 28 Sup. Ct. 163, 52 L. Ed. 278, the court quoted with approval from Holmes v. Goldsmith, 147 U. S. 150, 164, 13 Sup. Ct. 288, 292 (37 L. Ed. 118):

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances, the more correct their judgment is likely to be. The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though

remotely, to a determination probably founded in truth.' * * * The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases, because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

No exceptions were taken to the charge of the court, and a careful reading of it convinces that no error was committed by the court. The law was stated correctly, and the issues of fact fairly and impartially submitted to the jury. The only special request made on behalf of the defendants, and by the court denied, was for a directed verdict of not guilty. Without setting out the voluminous testimony (the trial lasted 24 days), we are convinced that there was substantial —in fact, we may say conclusive—evidence of the guilt of the defendants.

[5] Briefly stated the evidence established the following facts: The defendants organized a corporation under the name of the U. S. Live Stock Company, having its principal place of business in Omaha, Neb., with a pretended capital stock of $200,000, very little of which, if any, was paid in by the defendants, who organized the corporation, although some of the stock was sold to other parties on misrepresentations as to its value. The purpose of the corporation, as stated in the articles of incorporation, was to raise and sell live stock and engage in other businesses. They thereupon advertised in a number of newspapers published in several Western states, having a general circulation through the mails, that they had range horses for sale for cash or exchange for lands. The horses were represented as heavy, flat-boned, easily broken, weighing from 900 to 1,200 pounds. They never owned over 500 horses on the range in Arizona, where the horses offered for sale were claimed to be, yet they sold over 17,000 horses, realizing considerably over $100,000 in money and property. Bills of sale were executed to the purchasers, giving different brands; each bill of sale containing, in addition to the brand mentioned, the statements:

"Or any other horses in any brand I own on the range. * * * The above horses are sold running on the range in Coconino county, Arizona, and are to be gathered and loaded at the second party's [the purchaser's] expense. * * * It is further understood that other parties having horses in the above bands of horses have the same rights to gather their horses as the party of the second part."

There were a large number of letters sent through the mails by the defendants, some in the name of the U. S. Live Stock Company, others in the name of the Omaha Land & Investment Company, another corporation controlled by them, and some in the names of some of these defendants. Most of the letters were in reply to inquiries from parties, who had read the advertisements published in the newspapers, which were received through the mails; that, for the purpose of inducing the intending purchasers to buy these horses, they had photographs taken of a number of fine large horses, none of which were on or from the range in Arizona. At the time these photographs were taken no brands were on these horses, and the evidence shows these

supposed brands were scratched on the plates after the photographs had been taken and before they were developed. These photographs were shown to many of the purchasers, and represented to be true pictures of the horses offered and sold to them. It is also in evidence that those horses which were on the range were wild, small broncos; that it was hard to catch them; that less than 50 of them were ever captured, and they proved to be of little value.

[6] It is conclusively established that these defendants, and several of the others in the indictment, who were also found guilty, but did not prosecute writs of error, acted in concert in pursuance of agreements, and that in order to carry out the fraudulent scheme the United States mails were freely used by them. The evidence of the guilt of these defendants was so conclusively established that, even if there had been some error in the admission of evidence, and we do not hold that there was, the modern law so clearly stated by Judge Hook in Williams v. United States (C. C. A.) 265 Fed. 625 (opinion filed April 29, 1920), applies. Judge Hook there said:

"Whether prejudice results from the erroneous admission of evidence at a trial is a question that should not be considered abstractly or by way of detachment. The question is one of practical effect, when the trial as a whole and all the circumstances of the proofs are regarded. * * * It is manifest that he was not prejudiced by the admission of the testimony to which reference has been made."

This conclusion makes it unnecessary to consider whether the testimony objected to was relevant or material. We find no error in the record, and the judgments are affirmed.