## UNITED STATES v. WESCOAT.
### No. 3102.

Circuit Court of Appeals, Fourth Circuit.
April 13, 1931.

194

Bayless L. Guffy, Atty., U. S. Veterans' Bureau, of Washington, D. C. (James Damron, U. S. Atty., Okey P. Keadle and David F. Sheets, Asst. U. S. Attys., all of Huntington, W. Va., and William Wolff Smith, Gen. Counsel, U. S. Veterans' Bureau, of Washington, D. C., on the brief), for the United States.

Roderick G. Merrick, of Charleston, W. Va., for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

PARKER, Circuit Judge.

This is an action on a war risk insurance policy to recover disability benefits. Plaintiff was discharged from the army May 26, 1919. Premiums paid on the policy continued it in force until August 31, 1919. Plaintiff contends that he was then totally and permanently disabled within the meaning of the policy, and that he has continued in that condition. There was a verdict and judgment in his behalf, and the defendant has appealed.

It is not necessary to review the evidence. While there was some conflict as to the extent of plaintiff's disability, there can be no question that his evidence presented a case for the consideration of the jury within the principles laid down by us in Carter v. U. S., 49 F.(2d) 221, this day decided.

The trial judge erroneously instructed the jury, as he did in the case of United States v. Searls (C. C. A.) 49 F.(2d) 224, this day decided, that, where the insured developed active tuberculosis prior to January 1, 1925, he was presumed to have contracted it while in the army. We think, however, that the error here was harmless. In the first place there was practically no doubt under the evidence that the tuberculosis of plaintiff originated during his army service; and the controversy in the case was, not as to the origin of the disease, but as to the extent and permanency of the disability. In the second place, the court clearly, correctly, and fully charged the jury as to what constituted total and permanent disability within the meaning of the policy, charging them explicitly in this connection that, before plaintiff could recover, he must satisfy them, by a preponderance of the evidence, that he was totally disabled from carrying on continuously any substantially gainful occupation, and, in addition, that such disability was founded on conditions which made it reasonably certain that it would continue throughout his lifetime. In view of this charge, we do not think that the erroneous instruction that the disease was presumed to be of service origin could have prejudiced defendant; and in this respect the instant case differs from the Searls Case, where the presumption as to service origin was made practically determinative of the issue.

Defendant excepted to the admission in evidence of a tag, field medical card, and the envelope in which this card was contained, which were identified by plaintiff as having been attached to his clothing in a field hospital in France and worn by him when being sent to America with a group of disabled soldiers. The tag was dated "3/13/19" at Camp Montori C. H. 85, and purported to be signed by one Lieut. M. H. Keefer. The field medical card showed the dates of plaintiff's admission to various hospitals and the date of his being sent to the United States. It bore the signature of various officers of the Medical Corps of the United States Army and over the first of these appeared the following entry: "Came to sick call to have eyes examined. Has been failing in sight for some time. No other symptoms. P. E. Negative aside from eyes. Final diagnosis marked choroiditis bilateral." The envelope in which the field card was contained showed the diagnosis of plaintiff's ailment as "choroiditis bilateral." All bore the name of plaintiff, his rank, regiment, and identification number. No objection to their admission appears to have been made on the ground that they were not in all respects genuine, or

that they were not properly identified. While the record does not show the ground of the objection in the court below, and same might be ignored for that reason (U. S. v. U. S. F. & G. Co., 236 U. S. 512, 529, 35 S. Ct. 298, 59 L. Ed. 696; District of Columbia v. Woodbury, 136 U. S. 450, 462, 10 S. Ct. 990, 34 L. Ed. 472), we assume that the sole basis of the objection there, as it is here, was the rule against the admission of hearsay testimony.

We think it perfectly clear that these papers and the entries thereon fall within the exceptions to the hearsay rule. The entries were made in regular course by government officials, whose duty it was to record the facts, and who had no motive to record anything except the truth. They constitute, moreover, the best evidence possibly obtainable of the observations and opinions of the medical officers whose signatures appear; for, being made at the time of the observations and transactions recorded, they are necessarily more complete and accurate than could be the memory of a physician or surgeon of the details of the hundreds of cases that daily passed before him in a field hospital a dozen or more years ago. To exclude such evidence and to require disabled veterans in cases such as this to produce the army surgeons who treated them would be to deprive them of important evidence bearing upon the origin of their disability; for it would be practically impossible for them to locate and produce the surgeons who treated them and made the records, and, if produced, these surgeons would probably have no recollection of the matters to which the records relate.

The evidence offered falls clearly within the principles under which exceptions to the hearsay rule are admitted, i. e., necessity and circumstantial guaranty of trustworthiness. Wigmore on Evidence, vol. 2, §§ 1420 et seq. Tested by the first principle, the persons making the entries are not as a practical matter available as witnesses, and evidence of importance to the parties would be lost if entries made by them were not received. Tested by the second, the entries were made by highly intelligent officials of the government in the discharge of their official duties, with no motive to state anything but the truth and subject to reprimand and humiliation in the eyes of their professional associates if they were inaccurate. It is hard to imagine a situation where entries made would come with a stronger guaranty of their trustworthiness.

In the case of Mississippi River Logging Co. v. Robson (C. C. A. 8th) 69 F. 773, 781, certain scale books were admitted in evidence showing the amount of timber cut from plaintiff's land. It was objected that these books were not admissible and that the scalers should have been produced to testify to the facts; and what was said by the court there, quoting from the opinion of the judge below, is pertinent here: "The mode by which the entries are made on the scale book is such as to assure accuracy therein. The parties who cut and haul the logs, and the owner, who is to pay for the cutting and hauling, act upon the contents of the books, and deem them to be proper evidence of the facts therein stated. That which is received and acted upon by persons engaged in any line of business as competent evidence is ordinarily admissible when the same fact becomes a matter of inquiry in judicial proceedings. It would seem, therefore, that the scale books should be admitted in evidence, unless it appears that there is better evidence within the power of plaintiff to produce. It is said that the camp scalers should have been hunted up, and their testimony be introduced, in order to show the number of logs, and the contents thereof, cut on plaintiff's land during the time in controversy. What is sought to be proved is the result, in number and quantity, of the logs cut. When the scalers made the count and measurement, two records thereof were made,—one in the memory of the scaler, the other in the scale book. Which is now the best evidence? Years have elapsed. The entries on the scale books remain unchanged. They are now just what they were when originally made. Can the same be said of the record made upon the memory of the scalers?"

In Wisconsin Steel Co. v. Maryland Steel Co. (C. C. A. 7th) 203 F. 403, book entries showing amounts paid for wages and time cards signed by workmen upon which the book entries were based were held properly admitted in evidence, without the production of the workmen who signed the cards, both under the rules of the common law and under the Wisconsin statute, which was held to be merely declaratory thereof. In Heike v. U. S. (C. C. A. 2d) 192 F. 83, entries of weights of cargoes of sugar made by government weighers, and also those made by private weighers, were held competent in evidence, as entries made in the regular course of business, without producing the persons who made them. Other federal cases establishing the same rule will be found collected in the note to Wigmore, vol. 2, p. 281.

■ While the case at bar differs from a number of the cases cited, in that the records there offered were business entries of a permanent nature, whereas the records here are mere cards intended to serve a temporary purpose, we think that the cases cannot be distinguished in principle. The records were admissible in those cases, not because of their form or because they related to commercial transactions, but because they were made in the ordinary course of duty under such circumstances as to preclude the probability of their being false, because they furnished the best evidence obtainable as to the matters to which they related and because of the practical necessity of their being received if any evidence relating to those matters was to be had. All of these considerations apply to the records here. If the records made by laborers as to working time, by scalers of lumber as to measurements, or by weighers as to weights of cargoes, are to be received in evidence, we see no reason for excluding records made by officials of the government in treating wounded or diseased soldiers, where in the nature of things the officials cannot be produced, or, if produced, could not give testimony as satisfactory as the records themselves. The rules of evidence are not rules of a game. Their sole purpose is to enable courts to arrive at the truth of matters under investigation. The hearsay rule is important, but courts should not hesitate to recognize exceptions to it where such exceptions fall within recognized principles and are necessary to the ascertainment of truth and the doing of justice.

The other exceptions in the record do not merit discussion. For the reasons stated, the judgment below will be affirmed.

Affirmed.