## UNITED STATES v. CAMPANARO.
### No. 13150.

District Court, E. D. Pennsylvania.
Dec. 31, 1945.

812

Edward A. Kallick, Asst. U. S. Atty., of Philadelphia, Pa., for plaintiff.

Nathan Lavine, of Philadelphia, Pa., for defendant.

BARD, District Judge.

Defendant Peter Campanaro was tried before a jury and found guilty on an indictment charging the possession of fifty counterfeit obligations of the United States with intent to defraud. Defendant seeks a new trial on the ground that the court erred (1) in refusing to affirm certain requested points for charge, (2) in admitting in evidence over the objection of defendant five of the government exhibits, and (3) in admitting in evidence over the objection of defendant hearsay testimony with respect to the appearance in Watsonville, California, on or about February 6, 1940, of counterfeit bills similar to those found in the possession of defendant.

The facts, as developed at trial, insofar as they are relevant hereto, are as follows:

On May 5, 1945 Agents Gruber and Green of the United States Secret Service, together with other government agents, inspected the premises of the Bardinet Company in Morrisville, Pennsylvania. The company distilled and rectified alcoholic beverages and employed defendant as a rectifier. In compliance with the agents' request to disclose the contents of the desk, defendant produced, among other items, a metal container, found in the lower right-hand drawer. This can was filled with coriander seed which concealed a smaller can containing the counterfeit notes. Defendant denied any knowledge of counterfeit bills and the smaller can concealed by the seeds. He was arrested and removed to Philadelphia.

On May 6, 1945 Agent Green returned to the distillery and, in defendant's absence, found several articles in the storage building which were introduced in evidence over defendant's objection. These include a hand printing press (government exhibit 13); a wooden frame found near the press (government exhibit 4), and a piece of a counterfeit note attached to the frame of the same type found in the can (government exhibit 5). On May 21, 1945 Agent Green made a further search of the distillery and found a carton of chemicals (government exhibit 7) and two glass plates (government exhibit 6) which are all useful in reproducing the type of counterfeit bill found in the can and which were also introduced in evidence over defendant's objection.

Agent Gruber testified that defendant told him that he was in or near Watsonville, California in February 1940. The witness further testified that the records (of the Secret Service) showed that similar counterfeit bills first made their appearance in Watsonville, California on February 6, 1940. Defendant urges that this testimony was inadmissible as hearsay and since it was prejudicial, he assigns the admission of this testimony as one of the grounds for a new trial. The pertinent testimony is set forth in the margin.[1]

---

[1] F. W. Gruber—Direct

By Mr. Kallick:

"Q. Mr. Gruber, are you able to tell us when this type of counterfeit note first made its appearance in circulation? A. According to our records—

"Mr. Lavine: It is objected to, if your Honor please.

"The Court: I will sustain the objection to that general question. I do not know what you are talking about. I do not know if you mean back in 1912 or if you mean in this immediate vicinity, or what. I do not know. It may be all right but in that general way I will sustain the objection.

"Mr. Kallick: Perhaps I better see you at side bar with counsel. I do not want to say anything that might prejudice the defendant.

"Mr. Lavine: I object to the remark you made, Mr. Kallick.

"The Court: We will not make any side remarks, either one of you. You address the remark to the Court and we will rule on it. (The following proceedings took place at side bar, out of the hearing of the jury.) (Off the record).

"Mr. Kallick: I want to ask whether in the course of his duties there came to his attention notes that had been

■ It is elementary in our system be subjected to the test of cross-examinaof law that the testimony of witnesses must

put into circulation—counterfeit notes similar to the type of note as G–3.

"The Court: When you say similar counterfeit notes do you mean counterfeit five-dollar notes, is that the similarity?

"Mr. Kallick: No. He has already testified to the kind of manufacture it was. It was not a hand-made note. It was made with a press, and of course I have not brought that out as yet.

"The Court: What do you want to prove? All notes are similar if they are five-dollar notes.

"Mr. Kallick: Similar type of manufacture as he just described. I do not know how else to put it.

"The Court: Well, a while ago you said off the record at side bar that you contended that notes appeared in circulation that were made from the same identical press.

"Mr. Kallick: We do not have to prove the plate.

"The Court: That is what you said. What is the similarity?

"Mr. Kallick: It may be the serial number. I do not know.

"The Court: You do not know what you want to prove?

"Mr. Kallick: These men can testify to the details. They know exactly what marks are; what gangs are manufacturing these notes.

"The Court: What has that got to do with this case? You have not put anything on the record here now that will allow me to get this question in. You did not say that off the record at side bar. Just to say that they are similar notes, all five-dollar notes are similar in that they are five-dollar notes. Now, what is the similarity?

"Mr. Kallick: I want to prove that the notes that were found in his possession, similar notes were passed in California at or about the time that he was in California.

"The Court: They both have "$5" on them; in that they were similar. In what other respect do you want to show they were similar?

"Mr. Kallick: The workmanship, similar workmanship, and similar discrepancies in the notes.

"The Court: Do you want to prove that they were made from the same plate and the same press?

"Mr. Kallick: I want to prove that they are the same type of notes that he had in his possession.

"Mr. Lavine: I object for several reasons. The first reason is the answer

obviously would be based on information and would be hearsay. The second objection is that the witness has identified the notes as notes not made from an engraved plate, made by a photographic process, and any photographic reproduction of a five-dollar bill would be the same as any other photographic reproduction in that they are all photographs.

"The Court: The objection is sustained in the manner in which the District Attorney has offered to prove it, merely saying they are similar notes. I cannot allow it, but if you can show that this was made from the same photographic plate and that the printings were run off from the same negatives, and so forth, and show that those notes were made in the same place, why of course I will allow you to show that.

"Mr. Kallick: He would plead guilty if we could do that.

"The Court: But you cannot link up a five-dollar bill in California unless there is some similarity. I will let you ask it another way.

"Mr. Lavine: I might add—

"The Court: I have sustained it your way. Do not put anything on here. I will let you ask it if you do it in the right way, but not what you said. (The following proceedings took place in open court.)

"By Mr. Kallick:

"Q. Mr. Gruber, you have testified that there are four sets of serial numbers among these fifty notes, is that correct? A. Yes, sir.

"Q. Do you know of your own knowledge whether any counterfeit notes containing any of these four serial numbers have been in circulation? A. We don't go by the serial numbers because any serial number or any set of numbers can be affixed to the note. We go by the check letter and faceplate number which appears down in the lower right-hand corner as well as the backplate number.

"By the Court:

"Q. What is the check number on the bill you hold in your hand? A. This check number is J as in John, 870. The backplate number is 847.

"Q. How do those two agree in general? A. I would say that there is a chance in a thousand that you might get the same backplate number on the face of a note bearing the same faceplate number. It is very, very seldom that they might agree or could agree.

tion and confrontation.[2] Therefore, evidence which does not derive its value solely from the credibility of the witness, but rests also on the veracity of another person is termed "hearsay" and is ordinarily inadmissible. Hopt v. People of Territory of Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262. The vice of such evidence is that the other person upon whose credibility the jury must rely is not present in court and cannot be subjected to cross-examination. However, not every oral or written extrajudicial statement offered in evidence comes within the hearsay rule. It is only where the extrajudicial statement is offered to establish the truth of the fact so stated that the hearsay rule can apply. Where the extrajudicial statement is offered without reference to the truth of the matter extrajudicially asserted, but merely to prove that the oral statement, in fact, was made or that a written statement, in fact, exists, then the evidence is without the hearsay rule. Brolaski v. United States, 9 Cir., 279 F. 1; Petersen v. United States, 9 Cir., 287 F. 17. In the latter instance the witness avers the truth of facts within his own knowledge and may be cross-examined to establish the truth of the facts which he asserts. Wigmore on Evidence, 3d Ed., § 1766; Terry v. United States, 4 Cir., 51 F.2d 49.

■ Applying the rules set forth above, I find that the testimony of Agent Gruber to which objection was made, comes within the hearsay rule. In response to a question asking whether, in his knowledge, counterfeit obligations of the type found in defendant's possession had appeared, Agent Gruber answered: "Yes, *Our records show* that 12,000 have showed up so far. They made their first appearance on February 6, 1940, at Watsonville, California." (Italics supplied.) The answer, of course, was not responsive to the question. The witness did not limit his answer to facts within his own knowledge as to which he could be cross-examined, but included facts which he had discovered in the records of his agency. However, if the purpose of his testimony was to prove

"Mr. Lavine: What did you say was the front plate number?

"The Witness: J870 I believe.

"Mr. Lavine: And the backplate number?

"The Witness: 847 I believe it was.

"Mr. Lavine: So that those do not agree?

"The Court: No, 870 does not agree with 847.

"Mr. Lavine: As I understand Mr. Gruber's expert testimony, they do not agree on genuine bills.

"The Witness: That is right.

"The Court: You are asking the question, 847 and 870 do not agree. Everybody in the room agrees to that.

"By Mr. Kallick:

"Q. Can you tell us whether or not the counterfeit obligations have appeared to your knowledge with that front and backplate number?

"Mr. Lavine: That is objected to, if Your Honor please.

"The Court: Read that question, Mr. Reporter. (The question was read by the reporter as follows: "Can you tell us whether or not the counterfeit obligations have appeared to your knowledge with that front and backplate number?")

"The Court: I did not get a few of those words. I do not know what the question is. You may answer it if you can. I do not understand it.

"Mr. Lavine: I object to it.

"The Court: The objection is overruled. He may answer it if he can. Do you know what the question is?

"The Witness: Yes. Our records show that 12,000 have showed up so far. They made their first appearance on February 6, 1940, at Watsonville, California.

"By the Court:

"Q. When you say that these bills have shown up, what do you mean by these bills? A. This same note of the same face and backplates have circulated throughout the western part of the country for several years.

"Q. They have been made from the same plates? A. Yes, sir.

"The Court: All right.

"By Mr. Kallick:

"Q. What was the name of the town in California? A. Watsonville, California.

"By the Court:

"Q. How many did you say showed up? A. Our records show about 12,000 several hundred dollars of this particular note have so far been circulated.

"Mr. Lavine: If Your Honor please, I renew my objection and ask that the testimony be stricken.

"The Court: The objection is overruled since the witness has said that they were made from the same plate as these five-dollar bills.

[2] U.S.Const. Amend. VI: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

that the records did, in fact, contain the entries mentioned, then Agent Gruber's answer was not hearsay. As to the truth of that fact, Gruber could be cross-examined. Upon examination of all the testimony, I do not believe this to be the case. The purpose of the question and answer was to establish the fact that similar counterfeit bills had been previously circulated and had first appeared at a place where defendant visited and at a time when he was there. The truth of this fact depended on the veracity of those who had received the bills and on the veracity of the government agents who had investigated the matter and entered the information in the government records. As offered in evidence, the testimony did not permit defendant to test the truthfulness of these persons by cross-examination. For this reason Agent Gruber's testimony was hearsay and inadmissible.

It should be noted that there is statutory authority[3] for permitting the government to prove the same facts by offering in evidence a copy of the government records under the seal of the department. This statute merely codifies a common-law exception to the hearsay rule, that where the person whose statement is offered is unavailable for adequate reason and where there is circumstantial probability of the truthfulness of the evidence offered then the evidence is admissible even though hearsay. Wigmore on Evidence, 3d Ed., § 1420 et seq.; Demeter v. United States, 62 App.D.C. 208, 66 F.2d 188; United States v. Wescoat, 4 Cir., 49 F.2d 193. However, even this statute does not permit the contents of government records to be proved by parol testimony as was here done. Nock v. United States, 2 Ct.Cl. 451.

In order that the defendant be found guilty, it was incumbent upon the government to prove (1) defendant's possession of the counterfeit obligations, and (2) defendant's intent to defraud therewith. To establish the requisite criminal intent, the government introduced in evidence the equipment for photomechanical reproduction of counterfeit bills found on the Bardinet premises, raising the inference that defendant might have made the bills. The government also offered the "Watsonville evidence" to show that defendant might have previously circulated similar counterfeit notes. All of this evidence tended to prove that defendant's possession of the counterfeit money was not innocent but that the possession was with criminal intent to defraud.

The government urges that there was adequate evidence to prove defendant's intent to defraud and that the inadmissible "Watsonville evidence" was merely cumulative and harmless. United States v. Buchalter, 2 Cir., 88 F.2d 625. It is pure conjecture to assert on what evidence the jury relied to find criminal intent. Since the jury could have relied solely on the "Watsonville testimony" as proof of intent to defraud, I must hold that this inadmissible evidence was prejudicial to defendant. The "Watsonville testimony" was hearsay evidence and inadmissible, and, since it was prejudicial to the defendant, he is entitled to a new trial. Nicola v. United States, 3 Cir., 72 F.2d 780; Smith v. United States, 8 Cir., 267 F. 665, certiorari denied 256 U.S. 690, 41 S.Ct. 450, 65 L.Ed. 1173, 1174.

There remains for consideration the question whether defendant waived his right to move for new trial on this ground by not objecting properly to this evidence. Knoell v. United States, 3 Cir., 239 F. 16. Defendant did object to the question which elicited the inadmissible evidence. This objection was properly overruled. However, defendant failed to object immediately to the improper answer. Ordinarily, failure to object to the answer in this situation would be fatal because it would be considered that defendant thereby waived his right to exclude the improper evidence. Diaz v. United States, 223 U.S. 442, 32 S. Ct. 250, 56 L.Ed. 500, Ann.Cas.1913C, 1138. However, after a few more questions regarding the appearance of the bills in Watsonville, defendant renewed his objection and asked that the testimony be stricken without assigning any reason therefor. This objection was overruled. Further, in a prior side-bar discussion (as set forth in the margin), counsel for defendant had informed the Court that the answer to the proposed question would be based on information and would be objectionable as hearsay. For this reason, although it might have been better procedure to call the objectionable feature of the answer to the Court's attention again, counsel's failure to object immediately after the inadmissible answer was given is not fatal. Wigmore on Evidence, 3d Ed., § 18.

---

3 Rev.Stat.1875, § 882, 28 U.S.C.A. § 661.

Since the evidence was improperly admitted and was prejudicial, defendant is entitled to a new trial. In view of the fact that I have granted a new trial, it is unnecessary to discuss the other reasons for new trial advanced by defendant.

The case of Ayervais v. United States, 3 Cir., 72 F.2d 720, is not applicable to the facts of this case. The motion for judgment of acquittal is therefore denied.

Motion for new trial is granted.