## GLAZIER v. SPRAGUE S. S. CO.
(two cases).

### Civ. A. No. 10541; No. 31 of 1950.

United States District Court
E. D. Pennsylvania.

Feb. 27, 1952.

Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiff.

Krusen, Evans & Shaw, Philadelphia, Pa., for defendant.

KALODNER, Circuit Judge.

These cases involve two separate causes of action. The civil action, seeking recovery of damages for personal injuries, was brought under the Jones Act, 46 U.S. C.A. § 688. The action in admiralty is for maintenance and cure and wages. The two cases were consolidated for trial with a waiver of jury in the civil action.

The two causes of action arise out of incidents, hereinafter set forth in detail, which occurred on board the S. S. Julien Dubuque between the 15th and 20th of August, 1948, while the plaintiff-libellant, George W. Glazier, was a member of its crew as First Assistant Engineer.

On the basis of the pleadings, testimony and other evidence, I make the following

### Findings of Fact

1. Plaintiff-libellant (hereinafter referred to as "plaintiff") is a resident and citizen of the state of Pennsylvania. He was born on April 17, 1892.

2. Defendant-respondent (hereinafter referred to as "defendant"), Sprague Steamship Company, is a Massachusetts corporation; and at all times material hereto was the bareboat charterer in possession and control of the S. S. Julien Dubuque, a vessel owned by the United States of America.

3. On April 3, 1946, plaintiff was admitted to the U. S. Naval Hospital at Philadelphia, suffering from a coronary occlusion. He remained there until May 1, 1946. His hospital record at this time showed evidence of high blood pressure, or hypertension.

4. On January 3, 1948, plaintiff joined The Julien Dubuque in the capacity of First Assistant Engineer at a monthly wage of $402.93 plus overtime.

5. On August 15, 1948, while the vessel was at Helsingbord, Sweden, plaintiff was taken ill. A doctor, summoned aboard, diagnosed plaintiff's condition as a heart attack, and prescribed rest and medication.

6. Plaintiff remained in bed for about two days, after which he resumed his duties in the engine room. At about the same time he returned to work, he also went ashore in his spare time.

7. On August 19, 1948, plaintiff suffered a second heart attack. A doctor was again called and treated him. Plaintiff was relieved from further duty, the Second and Third Assistant Engineers standing his watch.

8. The vessel sailed from Helsingbord on August 19, with plaintiff sick in his berth, the doctor having considered it safe for him to make the journey back to the United States.

9. En route to Narvik, Norway, plaintiff's condition became worse. The vessel changed its course to Kristiansand, Norway, where plaintiff was taken ashore on August 20.

10. Plaintiff was hospitalized at the Kristiansands Kommunal Sykehus from August 20 to September 25, 1948, where he was treated for coronary thrombosis with myocardial infarction. Electrocardiograms taken on admission indicated the presence of an acute myocardial infarct involving the posterior wall of the left ventricle. During the course of his confinement he was treated with anticoagulants, and upon his discharge was advised to consult a physician when he returned to the United States.

11. Upon discharge from the hospital at Kristiansand, plaintiff went to Oslo, Norway. Here he suffered a relapse. On September 28, he was hospitalized in Oslo with signs of heart failure. He was discharged on October 19, 1948, and returned to the United States by vessel.

12. Upon his return to the United States in the latter part of October, plaintiff went to live with his daughter in Philadelphia, and put himself under the care of Dr. Albert E. Welsh, a local general practitioner. His complaints were shortness of breath, a dull ache in the chest and tiredness. Dr. Welsh treated him for coronary thrombosis. Examination of plaintiff by Dr. Welsh also revealed some evidence of arteriosclerosis and a blood sugar count of slighty above normal.

13. In the succeeding two months Dr. Welsh saw the plaintiff weekly, and, up to December 18, 1948, plaintiff's progress appeared to be normal. The pain had subsided somewhat, and there was less shortness of breath. At the time Dr. Welsh was of the opinion that he would soon be able to return to some form of light work.

14. On the morning of December 18, 1948, Dr. Welsh received an emergency call and found plaintiff in bed complaining of paralysis of the right side of the body.

15. Plaintiff was immediately taken to the U. S. Naval Hospital in Philadelphia. A physical examination upon admission revealed "slight weakness and loss of coordination in right arm and hand. Also slight diminution in pain sense there."

16. Plaintiff's hospital record for December 21 shows: "Still complains of numbness in right extremities which are definitely weaker than the left; however they have gained some strength since admission."

17. The entry for December 27, nine days after admission, indicates that at 10 P. M., "Patient was lying quietly in bed, when corpsman noticed that his mouth dropped and he was drooling. Exam revealed apparent motor aphasia, complete, but patient appeared to understand somewhat what was said. Right hemiparesis with complete paralysis of face and arm. Leg still has some motion." On December 29 there was notation of "Slight movement in right arm, right leg completely flaccid. Motor aphasia complete."

18. Plaintiff remained in the Naval Hospital until October 3, 1949. He was subsequently hospitalized for the following periods up to the time of trial; May 26, 1950 to November 1, 1950; December 27, 1950 to March 6, 1951; May 6, 1951 to May 15, 1951.

19. Plaintiff was examined in the Naval Hospital by Dr. Joseph B. Vander Veer on September 22, 1949. Dr. Vander Veer found evidence of diffuse arteriosclerosis, which had reached a fairly advanced stage in the arms and legs, to the extent that one pulse was missing in the right foot.

20. The hemiplegia, or paralysis, which first manifested itself on the morning of December 18, 1948, and then increased markedly nine days after admission to the hospital, was due to a cerebrovascular accident known as cerebral thrombosis, which is the formation of a blood clot in one of the arteries in the brain.

21. The cerebral thrombosis suffered by plaintiff was the result of arteriosclerosis, and was in no way caused by the damage done to his heart as the result of the heart attacks of August 15 and 20, 1948.

22. Maintenance has been stipulated at the rate of $6 per day. Defendant has voluntarily paid maintenance in the amount of $360, representing maintenance for the period from October 20, 1948 (approximate date of discharge from the hospital in Oslo) to December 18, 1948 (date hemiplegia first became evident). Since a period of three days elapsed between plaintiff's discharge from the hospital at Kristiansand (September 25, 1948) and his hospitalization in Oslo (September 28), and since the actual date of his discharge from the hospital in Oslo was October 19, 1948, rather than October 20, there is a period of four days, prior to December 18, 1948, for which maintenance was not paid.

23. There is a balance of earned wages due plaintiff in the amount of $618.95. This amount is being held as unclaimed wages by defendant. Plaintiff's wages for the balance of the voyage, which ended on September 10, 1948, amount to $282.03. These sums total $900.98.

## Discussion

It is plaintiff's contention, in the civil action, that the officers of The Julien Dubuque were negligent in not relieving him of all duties when he suffered the first heart attack on board the vessel, on August 15, 1948, and that this negligence was the proximate cause of his present total disability. I cannot subscribe to this contention.

It is undisputed that plaintiff's present condition of hemiplegia, with attendant loss of speech and softening of the brain, is the result of a cerebrovascular accident, or stroke, which first manifested itself on December 18, 1948, while he was recuperating from the two heart attacks at the home of his daughter in Philadelphia. Plaintiff has attempted to establish a causal connection between this cerebrovascular accident and the alleged negligence of the ship's officers. In brief, the theory of plaintiff's case is as follows: after the first heart attack on The Julien Dubuque, the doctor who was summoned aboard prescribed prolonged rest and medication; the ship's officers were negligent in failing to carry out these orders and in permitting plaintiff to resume his duties in the engine room after only two days in bed; by reason of being allowed to perform arduous tasks

in the engine room, plaintiff suffered additional damage to his heart, which ultimately brought about a cerebrovascular accident four months later. Thus, in order to show a causal connection between the alleged negligence and his present condition, it is essential that plaintiff establish a physiological relationship between the two heart attacks which occurred on board the vessel and the subsequent stroke. He has failed to meet the burden of proof in this respect, thereby rendering unnecessary a determination of whether the conduct complained of amounted to negligence under the circumstances.

The major types of cerebrovascular accidents such as plaintiff suffered are threefold: cerebral hemorrhage, cerebral thrombosis and cerebral embolism. Cerebral hemorrhage is the actual rupture of one of the arteries in the brain, with a pouring out of blood into the hemisphere of the brain, accompanied by severe headache and paralysis, and often resulting in death. Cerebral thrombosis is the blocking of a cerebral artery by a thrombus, or blood clot, which develops in situ—in the particular artery affected. One of the known causes of cerebral thrombosis is arterial disease (arteriosclerosis), in which the lining of a cerebral artery becomes roughened, and blood fribrin platelets collect on the roughened part until they fill up the artery and gradually shut off the blood supply to part of the brain. The third type, cerebral embolism, consists of a more sudden blocking of a cerebral artery by a clot which originates elsewhere in the body and is carried to the brain through the circulatory system. Plaintiff attempted to prove that he suffered a cerebral embolism as a direct result of the heart attacks of August 15 and 20, 1948. Defendant contended that the cerebrovascular accident was entirely unrelated to these heart attacks; that plaintiff

had long been suffering from a generalized condition of arteriosclerosis throughout his body; and that this disease resulted in a cerebral thrombosis which first manifested itself on December 18, 1948, completely independent of the two heart attacks.

Plaintiff's expert witness, Dr. Gelfand stated that in his opinion clots known as mural thrombi developed on the infarct area, or damaged tissue, of plaintiff's heart as a result of the two attacks on board the vessel; that one or more of these mural thrombi broke away from the inner wall of the heart, travelled through the blood stream and finally settled in a cerebral artery; and that the likelihood of this happening would have been greatly reduced had plaintiff been relieved of all duties and given complete bed rest after the first attack.[1] Defendant's expert witness, Dr. Vander Veer, stated that upon examination of the plaintiff in the Naval Hospital in September, 1949, he found "evidence of arterial changes of a rather marked degree", as well as a history of diabetes and high blood pressure, which are recognized causes of arterial disease. Dr. Vander Veer was firmly of the opinion that plaintiff's condition was the result of a cerebral thrombosis. In negativing the possibility of cerebral embolism he attached great significance to the lapse of four months between the two heart attacks in August and the onset of the paralysis in December, stating that the usual period of time during which emboli break loose from the heart wall after a myocardial infarct is from two to four weeks after the date of the attack, and that he had *never* seen it occur more than six weeks afterward.[2] His diagnosis was also based upon the mild onset of the paralysis and marked increase in symptoms between December 18 and 27, which he considered indicative of a "spreading clot" rather than the "sudden jolt" of an embolism.[3] I have

1. Dr. Gelfand stated that complete rest after the first attack "would certainly have limited the extent of the myocardial infarct"; and that "the larger the infarct, the larger the thrombi that form, and naturally the more chance you have for a piece of that thrombus breaking off and forming an embolus."

2. Four weeks is generally considered the normal danger period. See Dry, A Manual of Cardiology, p. 245 (2d ed. Phila. & London 1950).

3. There was some dispute as to the severity of the attack of December 18. Dr. Welsh, the attending physician, stated that he found plaintiff "in bed with a

credited the diagnosis of Dr. Vander Veer over that of Dr. Gelfand, and, accordingly, find that plaintiff's present condition is the result of cerebral thrombosis rather than cerebral embolism.[4]

 It is fundamental that in a Jones Act action the plain..ff must prove his case "by a preponderance of the evidence". Cruse v. Sabine Transp. Co., 5 Cir., 1937, 88 F.2d 298, 300, certiorari denied 1937, 302 U.S. 701, 58 S.Ct. 20, 82 L.Ed. 541. See also Sandoval v. Fruit Express Co., 1944 A.M.C. 580 (D.C.D.C.Z.1944). Plaintiff has not met this burden.

Further, the diagnosis of cerebral thrombosis was amply supported by other evidence—the predisposing factors of generalized arteriosclerosis, high blood pressure and mild diabetes, as well as the Naval Hospital records showing the increased symptoms characteristic of cerebral thrombosis. The "preponderance of evidence" is by far in favor of defendant. Plaintiff has failed to prove that the negligence alleged was the proximate cause of his present condition. Accordingly, he cannot recover damages in his civil action.

I state the following

## Conclusions of Law

1. Plaintiff has failed to establish a causal connection between the cerebro-vascular accident which first manifested itself in December, 1948, and the heart attacks suffered on board the S. S. Julian Dubuque.

2. Plaintiff has failed to establish that the alleged negligence of defendant's servants was the proximate cause of his present condition of hemiplegia.

3. Plaintiff is not entitled to recover damages in Civil Action No. 10,541.

paralysis of his right * * * leg and arm and a facial drop with some speech aphasia * * * ". However, the Naval Hospital records indicate plaintiff's neuromuscular condition upon admission as merely evidencing "slight weakness and loss of coordination in right arm and hand. Also slight diminution in pain sense there. Otherwise entirely normal * * * ". The first indication of a facial drop in the records appears in the nota-

4. Plaintiff is entitled to recover maintenance in the amount of $24 and wages in the amount of $900.98 in Admiralty Action No. 31 of 1950.

Orders may be submitted in accordance herewith.

tion for December 27, which was nine days after admission.

4. In making this finding I have not considered the diagnoses of the U. S. Naval Hospital physicians, which appear on plaintiff's hospital record, since they are inadmissible under the so-called Federal Shop Book Rule. New York Life Ins. Co. v. Taylor, 1945, 79 U.S.App.D.C. 66, 147 F.2d 297.