**Archibald LYLES, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 13467.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 30, 1957.

Decided Oct. 25, 1957.

Writ of Certiorari Denied May 19, 1958.
See 78 S.Ct. 997.

Mr. Robert T. S. Colby, Washington, D. C. (appointed by this Court), for appellant.

Mr. Donald E. Bilger, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Thomas A. Flannery, Asst. U. S. Attys., were on the brief, for appellee. Mr. Harold H. Greene, Asst. U. S. Atty., also entered an appearance for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting in banc.

PER CURIAM.

The judgment of the District Court is affirmed. Chief Judge Edgerton and Judges Bazelon, Fahy and Washington dissent.

Judges Prettyman and Burger file an opinion, prepared by them jointly. Four points are discussed, under separate headings I to IV. Chief Judge Edgerton and Judges Bazelon, Fahy and Washington agree with Point I of that opinion. They also agree with Point II, except that they are of the view the error of the District Court was reversible error. Judges Wilbur K. Miller, Danaher and Bastian concur on Points III and IV.

Judge Bastian files a separate opinion, in which Judge Wilbur K. Miller and Judge Danaher concur. Judge Bazelon, on behalf of himself, Chief Judge Edgerton and Judge Washington, files a dissenting opinion. Judge Fahy files a separate dissenting opinion.

PRETTYMAN and BURGER, Circuit Judges.

Appellant was indicted in December 1954 for robbery, grand larceny and unauthorized use of a motor vehicle. In a hearing conducted in February 1955 pursuant to 18 U.S.C. § 4244 (1952) it was determined that he was not mentally competent to stand trial; accordingly he was committed to an institution to remain in custody until he was competent to be tried.

Another hearing as to his competency was held in November 1955 and he was then judicially declared competent to be tried and was ordered to trial. On trial he pleaded not guilty and relied on a defense of insanity. The grand larceny charge was dismissed by the prosecution. The jury returned a verdict of guilty as to robbery and unauthorized use of a motor vehicle. He was duly sentenced and this appeal followed.

While the case was under consideration by a division of this court the full court voted for a re-hearing in banc.

Our present consideration is addressed to several issues which can be stated as follows:

1. In cases where the defense of insanity is asserted what, if anything, should the court instruct the jury about the consequences of a verdict of not

guilty by reason of insanity, pursuant to D.C.Code § 24–301?

2. Is a trial judge prohibited in all cases from referring, either in the course of summarizing the evidence or in exercise of his power to comment on the evidence, to testimony that the accused is not presently suffering from a mental disorder?

3. May the trial judge admit in evidence on the issue of insanity under the Federal Shop Book Act a record of a psychiatric opinion that the accused was suffering from a mental disease or defect at a date prior to commission of the act?

4. When not objected to on trial or raised on appeal, is it reversible error under 18 U.S.C. § 4244 for the trial judge to permit the judicial finding of competency to stand trial to be read into the record as a counterbalance to defense counsel's introduction of an earlier finding that the accused was *not* competent to stand trial?

I

The judge told the jury:

"If a defendant is found not guilty on the ground of insanity, it then becomes the duty of the Court to commit him to St. Elizabeths Hospital, and this the Court would do. The defendant then would remain at St. Elizabeths Hospital until he is cured and it is deemed safe to release him; and when that time arrives he will be released and will suffer no further consequences from this offense."

■ This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. But we think that doctrine does not apply in the problem before us. The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955.[1] It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts.

■ We do not prescribe a form of instruction. We think a recitation of the statutory procedure in great detail, such as reading the entire section of the statute, would tend to increase confusion. We think that when the instruction is given the jury should simply be informed that a verdict of not guilty by reason of insanity means that the accused will be confined in a hospital for the mentally ill until the superintendent has certified, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or to others, in which event and at which time the court shall order his release either unconditionally or under such conditions as the court may see fit. We discussed this matter in Taylor v. United States, which was decided [2] prior to the enactment of the present statute. Elaboration here is unnecessary.

■ Sometimes a defendant may not want such an instruction given. If that appears affirmatively on the record

---

1. 69 Stat. 610, D.C.Code § 24–301 (1951) (Supp. V).

2. 95 U.S.App.D.C. 373, 379, 222 F.2d 398, 404 (1955).

we would not regard failure to give it as grounds for reversal. Otherwise, whenever hereafter the defense of insanity is fairly raised, the trial judge shall instruct the jury as to the legal meaning of a verdict of not guilty by reason of insanity in accordance with the view expressed in this opinion.[3]

The language used by the trial court in the present case is not as precise as it might have been in stating the content of the statute. But we think this failure is not error sufficient to require or justify reversal.

## II

Having made to the jury the statement above quoted and discussed, the trial judge immediately said:

> "I think I should add that Dr. Cushard of St. Elizabeths Hospital testified, as you will recall, that on a prior occasion he found no mental disorder whatever in the defendant, and that the defendant was a man of average intelligence."

Dr. Cushard had so testified.[4] The question is whether the trial judge erred in making the quoted remark at the time and in the context in which he made it. Clearly the trial judge could summarize and comment upon this part of the evidence, as he could upon all or any of the evidence, when he was summarizing the evidence in the case. Error is urged because he called attention to this evidence not in the course of his summation of evidence but in immediate connection with his statement to the jury that if acquitted by reason of insanity Lyles would be committed to a mental institution. The quoted remark is said to convey an emphatic inference that if so committed Lyles would shortly be released.

In a criminal case claims of insanity are possibly pertinent at three points of time, (1) the time of the offense, (2) the time of the trial, and (3) the time of possible release after acquittal by reason of insanity. These points of time may be widely separated. Three different questions are pertinent upon these three occasions. (1) As of the time of the offense the question is whether the accused had a mental disease or defect and whether his alleged criminal act was the product of such disease or defect. The basic concern of the law at that point is whether the accused was in such mental condition that he should be held responsible for his crime. This is a matter of evidence and a question to be decided by a jury, unless there is no real conflict in the evidence.[5] It is part of the trial for the offense. The inquiry, and the decision, must be as of the time of the offense. Evidence as to the accused's mental condition either before or after the offense may be admissible, but it is admissible only in so far as it is relevant to his condition as of the time of the offense.

(2) As of the time of the trial the question, as prescribed by statute, is whether the accused is mentally competent to understand the nature of the charges against him and to assist in his defense. He may have a mental disease, and the mental disease may have been the cause of his criminal act, and he may be suffering from the same disease at the time of his trial; but it is a scientific fact that he nevertheless may be competent to stand trial under this definition of competency. A paranoiac or a pyromaniac may well understand the charges against him and be able to assist in his defense. "To assist in his defense" of

---

**3.** Our view is not without historic precedent. See Hadfield's Case, 27 How.St. Tr. 1282, 1355 (1800), where the Lord Chief Justice in directing a verdict told the jury the defendant would be confined if they followed his submission that they return a verdict of not guilty by reason of insanity.

**4.** Dr. Cushard had also said:
"* * * We found, at least in our

opinion, he had what is known as a personality disorder, specifically, sociopathic personality disturbance.
 \* \* \* \* \*
"* * * Sociopathic personality is a newer term for what was formerly referred to as psychopathic personality."

**5.** Cf. Douglas v. United States, 99 U.S. App.D.C. 232, 239 F.2d 52 (1956).

course does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc. The standard of measurement of competency to stand trial is different from the standard of measurement for responsibility for a criminal act.

 The jury has no concern with the accused's competency to stand trial. That question is solely for the judge. Evidence in respect to this defined competency is not admissible before the jury, because it is not relevant to any question which the jury has to decide. We repeat, for emphasis and lest we be misunderstood, that evidence as to insanity at any time—the present as well as any other—may be admitted in so far as it is relevant to the mental condition of the accused at the time of the offense; that is, where it is used by a witness as part of the data upon which he bases a conclusion as to mental condition at the time of the offense. What we are here saying is that the competency of the accused at the time of trial to understand the charges against him and to assist in his defense is a legal question for the judge, not for the jury, evidence in respect to that question is inadmissible, and the judge must not comment on that subject to the jury.

(3) As of the time of proposed or potential release from commitment the question is whether the accused has regained his sanity and whether he will in the reasonable future be dangerous to himself or others. That determination is confided by the statute [6] in the superintendent of the hospital and the court. The function of each is a real responsibility.

 This third question is different from the question of mental responsibility for the alleged criminal act and from the question of mental competency to stand trial. It involves the possible danger attending the release of the accused. The jury upon the trial has no concern with the mental state of the accused at some future time, or with what the

superintendent of the hospital may some day certify, or with what the court may thereafter find. These questions are in the future and cannot be determined as of the time of trial. They are by statute for the court and the superintendent, not for a jury—*a fortiori* not for the jury in the box at the trial for the offense. The jury is entitled to know, as we have said, the legal significance of a verdict they are called upon to consider as part of their duty at the trial. They have no concern with a factual situation which may or may not develop in any one of many possible combinations of circumstances after their duties have been discharged and they are gone from the case. Evidence in respect to what the situation might be when in the future the problem of release from commitment arises is inadmissible at the trial. Evidence as to present mental disease may, as we have already twice said, be relevant and material to the problem of mental disease at the time of the offense, and it is admissible for that purpose. But such evidence is not admissible for the purpose of attempting to show the probable mental condition of the accused at some future time of possible release.

 From the foregoing it necessarily follows that, if the judge submits to the jury the question of probable release of the accused at some future date, submits evidence to them upon that point, or comments to them respecting the speculative possibilities in that regard, he commits error.

 In the case at bar the remark of the judge was a single sentence in the middle of a long charge. Moreover the court did not relate the remark of the doctor to the time of the trial or to any possible future time. The judge said that "on a prior occasion" the doctor found no mental disorder in the defendant; he did not identify the time of the prior occasion. No objection was made to the charge as given although prior notice of intention to object had been given. It seems to us that, in view of

6. Supra note 1.

the nature of the remark, the fact that the judge did not emphasize it or impress it upon the jury unduly, the fact that he dated the opinion of the doctor as of an indefinite past time, the remark cannot be held to have affected substantial rights of the accused. We decline to reverse this case on this point.

## III

This court in New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297 (1944), following the great weight of authority in federal courts (and in state courts with similar statutes), held that the written record of an expert medical opinion as to a psychiatric disorder is not admissible under the Federal Shop Book Act, 28 U.S.C. § 1732 (1952).[7] That Act provides for the admission of "any writing or record . . . of any *act, transaction, occurrence,* or *event* . . . if made in the regular course of any business . . .." (Emphasis added.) Essentially this court's holding turned on the fact that an expert psychiatric opinion is not an "act, transaction, occurrence, or event." Unlike observations of physical facts, e. g., temperature, pulse rate, age, weight, etc., recorded in normal course, it does not meet the tests of reasonable "reliability" which led to enactment of statutory exceptions to the hearsay evidence rule. Subsequently in 1956[8] this court emphasized the distinction between a recorded observation of glass fragments in the human body and a recorded expert opinion of a psychoneurotic condition as in the Taylor case.

In the present case the defense sought to buttress its evidence on the appellant's asserted insanity by offering to show a "pattern" of mental disease. Such a "pattern" could, of course, be shown by conventional evidence by witnesses having knowledge of the facts as to his conduct, prior medical diagnosis and treatment. But the admission of a written *opinion* of a psychiatrist only by the naked record of his recorded conclusions, without his being present and with no opportunity to cross-examine as to the foundation for the opinion, is plainly not warranted by the language or the history of the Federal Shop Book Act. Indeed, the very line of demarcation is the distinction between the reasonable reliability of recorded facts on the one hand, and controversial technical opinions on the other. The difference between a "fact" (such as an act, transaction, occurrence or event) and an "opinion" is one of the fundamental differences in the law of evidence. A fact can be testified to by any witness, but, with a few exceptions, an opinion can be given in evidence only by an expert, and the qualifications as an expert and reasons for his opinion are part of the premise for allowing him to testify. The Shop Book Act deals essentially with facts. The dissenting comments concerning admissibility of autopsy reports or bacteriological slides are not relevant, since they are records of observed physical conditions, not opinions.

To submit to a jury a written notation of a medical opinion upon a complex and difficult matter, without presentation of any witness and without cross examination of the author of the opinion, would be to submit as a fact the medical conclusion of a doctor without inquiry, showing, or cross examination as to his qualifications, the data upon which he rested his opinion, or the reasoning by which he reached his conclusion. That is the vice of submitting to a jury, without a witness, hospital notations of mere opinion. Gross injustice and error could easily ensue from such a course.

The District Court correctly excluded the records of prior psychiatric opinions concerning the appellant.

## IV

The trial court permitted government counsel to read to the jury the order in which the court had made its finding that the defendant was competent to

---

7. Formerly 28 U.S.C. § 695.

8. Washington Coca-Cola Bottling Works, Inc., v. Tawney, 98 U.S.App.D.C. 151, 233 F.2d 353 (1956).

stand trial. The question arises under Section 4244 of Title 18 U.S.C.

The pertinent part of that section reads as follows:

"A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury."

 The ruling of the trial court, standing alone and stripped of its setting, was error. It arose when counsel for the accused as a matter of trial strategy offered in evidence a February 1955 order of the District Court adjudicating the accused incompetent to stand trial, which was admitted. In rebuttal the Government offered a later District Court order, dated November 1955, finding competency. The defense did not object, and the order was admitted. Thus in the circumstances of this case the accused gained a valuable point since his defense was insanity *at the time of the offense*. The order of incompetency was nearer the time of the offense than was the order of competency, and so the defense, by offering the earlier order and not objecting to the later one, laid a vivid basis for the view that the obvious competency of the accused in the courtroom standing trial was a late development, occurring, according to the face of the record, long after the offense. It seems to us that under these peculiar circumstances the ruling of the trial court was not prejudicial error. The statutory proscription against advising the jury about an order of competency is for the benefit of the accused, to prevent his defense of insanity from going to the jury accompanied by the impact of a formal court finding that he was later competent. But in the present

state of the law there is no barrier to a waiver of the benefit thus bestowed upon him especially where it is a calculated maneuver.[9] While the introduction of the finding of competence violated an express statute, we think the right to have this evidence excluded is a "right of an accused to insist on a privilege which Congress has given him." Bruno v. United States, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257 (1939). In other words, the appellant could have insisted on the exclusion of the later order but having introduced evidence on the same subject in his own behalf in form of the earlier finding that he was *not* competent to stand trial and having acquiesced in the admission of the finding proscribed by the statute, he has deliberately waived his right to insist on the exclusion of the finding.

The judgment of the District Court is

Affirmed.

BASTIAN, Circuit Judge, with whom WILBUR K. MILLER and DANAHER, Circuit Judges, join, concurring in the result.

I am unable to agree with all that has been written by my brothers Prettyman and Burger in their opinion, although I agree that the judgment of conviction should be affirmed. With much (Points III and IV), as will be seen, I do agree.

## I

It seems to me unwise and unnecessary that a jury be told the result of their verdict of "not guilty by reason of insanity." In Federal courts, as at common law, the jury are not told the quantum of punishment which may be meted out if they convict,[1] or that probation may be granted. For instance, they are not told that if a defendant is found guilty of manslaughter he may be punished by a fine not exceeding $1,000 or imprisonment not exceeding 15 years, or

9. Cf. Bailey v. United States, 101 U.S.App. D.C. 236, 248 F.2d 558 (1957).

1. Except in those rare cases where they have something to say about the punish-

ment, e. g., in convictions for rape, where the jury may add to the verdict of guilty "with the death penalty."

both. This is salutary, since their only function is to determine from the evidence the factual issue of guilt or innocence, and in reaching a verdict they should not be swayed by an extra-evidentiary consideration such as whether they approve of the possibility of probation or of the penalty which may be imposed by the trial judge. The jury will probably know, as Judges Prettyman and Burger suggest, that a verdict of guilty will result in the imposition of punishment unless probation is granted, but they will not know what the punishment may be and, therefore, will not be influenced to acquit if they consider the possible penalty too severe.

The issue of insanity, fairly raised, does no more than present another factual question to the jury: whether the defendant was mentally responsible when the criminal act was done. That issue also should be determined on the basis of the evidence only and, in deciding it, the jury should not be influenced by a consideration of the result of an acquittal by reason of insanity; that is an extraneous consideration wholly unconnected with the evidence from which the jury must reach a determination of the factual issue raised concerning the defendant's mental condition.

In short, the jury should be told nothing as to how the defendant will be dealt with in case of acquittal by reason of insanity. But the majority of the court require that an instruction be given as to the consequences of such a verdict, unless the defendant does not want it. In giving the instruction, I think the trial judge should first caution that the jury's verdict should not be influenced by consideration as to what follows from a verdict of not guilty by reason of insanity. Thereupon, having made clear that the defendant has requested the instructions, the judge should inform the jury that two possible courses have been prescribed.

The statute *first* requires that one acquitted by reason of insanity shall be ordered confined in a hospital for the mentally ill. The statute *next* requires that any person who was so confined must be released if the superintendent of the hospital shall certify, and the court shall thereafter judicially determine, that such person has recovered his sanity and will not in the reasonable future be dangerous, because of some mental disease or mental defect, either to himself or to others. Although, as I have already indicated, I am of the opinion that the jury should not be told anything as to the consequences of such a verdict, since a majority of the court now hold that such an instruction should be given unless the defendant does not want it, I fully agree with Judges Prettyman and Burger that the instruction, when given, should tell the jury the *entire* impact of the statute, *i. e.*, that release, either with or without conditions, is mandatory as soon as the defendant has recovered and is no longer dangerous. This phase of their holding repairs what I have regarded as a critical inadequacy of the so-called Taylor[2] instruction and puts the subject in proper perspective, if it must be discussed at all.

Moreover, it should not be forgotten, the statute affords such a person the benefit of a writ of habeas corpus at all times to protect him against illegal confinement.

## II

I think there was no error in the comment of the trial judge, in his charge, as to Dr. Cushard's testimony or in the context in which it was used. I agree that no substantial rights of the appellant were affected.

## III

I agree that we should reiterate our view as expressed in New York Life Ins. Co. v. Taylor, 1945, 79 U.S.App.D.C. 66, 147 F.2d 297, approved in Washington Coca-Cola Bottling Works v. Tawney, 1956, 98 U.S.App.D.C. 151, 233 F.2d 353, and for the reasons expressed in the Prettyman-Burger opinion.

2. 1955, 95 U.S.App.D.C. 373, 222 F.2d 398.

## IV

I further agree that we should not reverse this case because of the supposed error of the trial court in reading to the jury the order in which the court had made a finding that the defendant was competent to stand trial—not only because of the circumstances in which it was presented to the jury, but because no objection was made to the court's action. Only in exceptional cases (and this is not one) should we reverse a case in the absence of objection duly made.

BAZELON, Circuit Judge, with whom Chief Judge EDGERTON and Judge WASHINGTON join, dissenting:

### As to Point I

The false assumption that acquittal by reason of insanity, like outright acquittal, frees the accused to walk out on the streets may lead juries to convict, despite strong evidence of insanity at the time of the crime. See Durham v. United States, 1956, 99 U.S.App.D.C. 132, 237 F.2d 760. It was to obviate this danger that the court established the Taylor rule.[1] In Point I of their opinion, in the instant case, Judges Prettyman and Burger revise and clarify that rule in the light of the 1955 revision of the statute. I agree with that part of their opinion.

### As to Point II

I agree with Judges Prettyman and Burger that the trial judge committed error when, after correctly charging the jury that acquittal by reason of insanity would result in appellant being committed to St. Elizabeths Hospital until restored to sanity and deemed safe to be released, he tacked on the statement, "I think I should add that Dr. Cushard of St. Elizabeths Hospital testified, as you will recall, that on a prior occasion he found no mental disorder whatever in the defendant, and that the defendant was a man of average intelligence." But I think the error requires reversal.

The effect of the judge's statement was to suggest to the jury that appel-lant would shortly be released if they found him not guilty by reason of insanity and to invite them to base their judgment upon that consideration rather than upon the evidence. And this effect was not accidental. It was exactly what the judge intended his statement to accomplish. Thus, when he agreed to give the jury the Taylor instruction, he said: "I think I would be less than candid with the jury and not quite fair to the jury if I would not supplement the statement by saying that apparently the St. Elizabeths doctors consider him sane now." Upon defense objection to such supplementation, the judge gave counsel a choice of the supplemented instruction or none at all. So both the purpose and effect of the erroneous instruction were to deprive of significance the instruction which, in Point I of their opinion, my brothers rightly find so important. The error "goes far to deprive the insanity defense of any real meaning as a jury issue." Durham v. United States, 99 U.S.App.D.C. at page 134, 237 F.2d at page 762.

In connection with Point II, two additional matters require some comment.

1. From the fact that the accused is on trial, the jury inevitably infers that he is at least sane enough to be tried. There is danger that they may leap from this inference to the conclusion that, if acquitted by reason of insanity and hospitalized, he would immediately be released. But, as my brothers show, qualification for release from a mental hospital is a different thing from competency to stand trial and evidence of present mental condition "is not admissible for the purpose of attempting to show the probable mental condition of the accused at some future time of possible release." I would, therefore, hold, where the defense of insanity is relied on, that the jury should be instructed, as a protective measure, that a person may be mentally competent to stand trial and yet suffering from such mental illness as to justify holding him under hospital restraint if

---

1. Taylor v. United States, 1955, 95 U.S.App.D.C. 373, 222 F.2d 398.

he should be acquitted by reason of insanity. See Durham v. United States, 99 U.S.App.D.C. at pages 133–134, 237 F.2d at pages 761–762.

2. The trial judge referred to Dr. Cushard's testimony a second time in his summary of the evidence on the issue of appellant's mental condition at the time of the crime. Though Lyles' 1955 mental condition had some relevance to his condition at the time of the crime, the judge's summary of Dr. Cushard's testimony was improper because it was inaccurate.

Dr. Cushard's testimony was that, during Lyles' confinement at St. Elizabeths in 1955, he had been found to be "without mental disorder." But the court failed to advise the jury that Dr. Cushard also testified that Lyles suffered from "a personality disorder, specifically sociopathic personality disturbance * * * a newer term for what was formerly referred to as psychopathic personality." Since the witness did not explain the sense in which he used the words "men-

tal," "personality," "disorder," and "disturbance," this testimony might have been understood in several ways: (1) he might have meant that, in his opinion, Lyles' psychopathic condition was not of such a type as to constitute a mental illness; or (2) he might have meant that, in his opinion, psychopathy is never a mental illness;[2] or (3) he might have meant that he entertained two opinions, without any attempt to harmonize them, (a) that Lyles was without mental disorder and (b) that Lyles was a psychopath.

Whether psychopathy generally or of a particular type, constitutes a mental illness is properly the subject of expert opinion. It is for the jury to determine whether the psychopath suffers from such a mental disease or defect as to discharge him of criminal responsibility. Stewart v. United States, 1954, 94 U.S. App.D.C. 293, 295, 214 F.2d 879, 882.[3] Thus, the jury must consider the whole of the doctor's opinion, which includes the diagnosis of psychopathy.[4] More-

2. A witness of Dr. Cushard's qualifications and stature is, of course, aware that the dictionary definition of "psychopathic" is "pertaining to mental diseases," Maloy, Medical Dictionary for Lawyers (2d ed. 1951); Dorland, The American Illustrated Medical Dictionary (18th ed. 1938); that such men as his own superior at St. Elizabeths Hospital include psychopathic or sociopathic personality among the various "mental disorders" or "mental aberrations" which psychiatrists recognize and treat, Overholser, The Psychiatrist and the Law (1953), ch. 1; Overholser and Richmond, Handbook of Psychiatry (1947), ch. 13; see also Guttmacher and Weihofen, Psychiatry and the Law (1952), ch. 5; Banay, We Call Them Criminals (1957) 169; and that psychopathy is sometimes successfully treated by electroshock therapy and even by brain surgery. Banay, op. cit. supra at 170; Guttmacher and Weihofen, op. cit. supra at 105. We would not, therefore, in the absence of a clearer statement of his position, read his testimony as meaning that in his opinion psychopathy is never a mental disorder.

3. Guttmacher and Weihofen, Psychiatry and the Law (1952) 94–99, call attention to a Maryland case in which, under

the right and wrong test, the jury concluded from psychiatric evidence of the accused's psychopathy that he was not guilty by reason of insanity.

4. We have said that the jury, in determining an individual's mental condition, "should be free to consider all information advanced by relevant scientific disciplines," so that it "will be guided by wider horizons of knowledge concerning mental life." Durham v. United States, 1954, 94 U.S.App.D.C. 228, 238–239, 242, 214 F.2d 862, 872, 876, 45 A.L.R.2d 1430. The law does not attach consequences to medical labels. Legal consequences depend rather upon the jury's determination, from all the facts, as to the individual's mental health or illness. Testimony that the individual suffers from a named condition, e. g., psychosis or psychopathy, is of aid to the jury only to the extent that the jury is otherwise informed of the nature of the condition. Since the nature of psychopathy is plainly not a matter of common knowledge, the jury's information must be supplied by witnesses. If psychiatrists are inclined to testify in medical conclusions, the lawyers should seek to elicit by examination testimony which is meaningful to the jury. And if the lawyers neglect to perform

over, to the extent that Dr. Cushard's testimony involved a possible contradiction, the jury was entitled to consider whether the weight of the opinion that the accused was without mental disorder was affected by the opinion that he was at the same time a psychopath. An instruction to the jury which focuses attention on the witness' opinion that the accused was without mental disorder and fails even to mention the diagnosis of psychopathy is a distortion of the evidence and beyond the judicial privilege of summary or comment. Quercia v. United States, 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321; Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 244 F.2d 355, 365.

### As to Point III

The evidence shows that, some seven years before the alleged crime, appellant had been receiving electroshock treatments as a prisoner at the Virginia State Penitentiary and that, some ten or eleven years before that, he had been transferred from Leavenworth Penitentiary to the United States Hospital for Defective Delinquents at Springfield, Missouri, and there confined for two years. The records of the latter institution show that appellant was then suffering from schizophrenia. In an effort to establish a long-continuing state of mental illness, from which the jury might infer that he was mentally ill at the time of the crime, appellant sought to introduce the Springfield Hospital records to show the diagnosis of his illness as schizophrenia. The trial judge excluded the evidence upon the ground that, under New York Life Ins. Co. v. Taylor, 1944, 79 U.S.App. D.C. 66, 147 F.2d 297, he had "no choice in the matter." I agree with the majority that under New York Life the evidence was inadmissible. But I think that case is wrong and should be overruled. I further think that the evidence was clearly admissible under United States v. Balance, infra, which the majority has apparently not considered.

In holding, in New York Life, that records of diagnoses are inadmissible under the Federal Business Records Act,[5] we are at odds with "the vast majority of courts [which] readily admit not only routine observations by medical personnel in a hospital record but also diagnoses of a patient's physical and mental condition."[6]

Even before the enactment of the Federal Business Records Act, hospital records containing more than merely routine physical observations were admitted in evidence, either under the common law business entry exception to the hearsay rule[7] or under the public documents exception.[8] In United States v. Balance, for example, four years before the Act was adopted, we said on the matter of records of diagnoses:

> "The report, so far as it contained an abstract of the observations and opinions of the medical officers, verified by their signatures, was admissible. Nor do we think the fact that these examinations were made on application for compensation affects admissibility. They were all made by physicians employed by the government; and were a part of the official records of a department of the government. They were made in the performance of official duty, and were presumably correct, and in the circumstances we think it would be unreasonable to require plaintiff in

that function, it is within the power of the trial judge to examine the witnesses for the purpose of elucidation.

5. 28 U.S.C. § 1732(a) (1952 Supp.), formerly 28 U.S.C. § 695.

6. Note, 48 Col.L.Rev. 920, 929 (1948).

7. Adler v. New York Life Ins. Co., 8 Cir., 1929, 33 F.2d 827, 832; see, also, Grossman v. Delaware Electric Power Co., 1929, 4 W.W.Harr. 521, 34 Del. 521,

155 A. 806, holding admissible under the business entries exception to the hearsay rule a history sheet and laboratory sheet bearing notations of the doctor's interpretation of the results of examinations.

8. United States v. Balance, 1932, 61 App. D.C. 226, 227–228, 59 F.2d 1040, 1041–1042; United States v. Wescoat, 4 Cir., 1931, 49 F.2d 193, 195.

a war risk insurance case always to summon the government doctors personally, for that frequently would be impossible, or at least abortive."[9]

The rationale of the pre-Business Record Act cases is the same whether based upon the business entry exception or the public documents exception: the records are admissible because the circumstances under which they were prepared furnish an assurance of trustworthiness and minimize the need for cross-examination. In Professor Wigmore's phrase, in these cases "the test of cross-examination would be a work of supererogation."[10] The contrary decision in New York Life, after the enactment of the Business Records Act, is supportable only on a theory that the effect of the Act has been to narrow the field of admissibility.

The purpose of the Act was to obviate the necessity of identification of records by the persons making them, a task which was "exceedingly difficult, if not impossible, in the case of an institution employing a large bookkeeping staff * * *."[11] By the terms of the statute, a record is admissible if (1) it was made in the regular course of business and (2) it was the regular course of that business to make such records at or about the time of the matter recorded. All other circumstances of the making of the record are to affect the weight of the evidence, but not its admissibility. The two self-contained limitations of the Act were satisfied in New York Life for, as the majority decision pointed out:

"A literal reading of the above statute would make the records in this case admissible on the theory that the business of operating a hospital requires records of the histories of patients, reports of unusual conduct and also diagnoses by physicians."[12]

But the majority, in New York Life, noting that the Supreme Court, in Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, had construed the statute to apply only to "routine reflections of day-to-day operations,"[13] felt that certain types of hospital records should be excluded. I think this court, in attributing to the Supreme Court a construction of the Federal Business Records Act which restricts rather than expands the area of admissibility of records, has misread the Palmer case. See Medina v. Erickson, 9 Cir., 1955, 226 F. 2d 475, 482–483, certiorari denied 1956, 351 U.S. 912, 76 S.Ct. 702, 100 L.Ed. 1446; Buckminster's Estate v. Commissioner of Internal Revenue, 2 Cir., 1944, 147 F.2d 331.

Palmer v. Hoffman decided that a railroad employee's report of an accident was to be excluded because such reports "are not for the systematic conduct of the enterprise as a railroad business. * * * Their primary utility is in litigating, not in railroading."[14] The Court said:

"* * * It is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with

---

9. Supra note 8. Under this dictum, the records in the New York Life case, being those of a Government hospital, should have been admissible, but the public documents exception to the hearsay rule does not appear to have been urged as a ground for admission. The dictum of the Balance case, similarly, calls for admission in the instant case of the records of the Springfield Hospital. See Judge Fahy's dissenting opinion.

10. 5 Wigmore, Evidence (3d ed. 1940) p. 202.

11. Palmer v. Hoffman, 1943, 318 U.S. 109, 112, 63 S.Ct. 477, 480, 87 L.Ed. 645; S. Rep. No. 1935, 74th Cong., 2d Sess., pp. 1–2.

12. 79 U.S.App.D.C. at page 69, 147 F.2d at page 300.

13. Ibid.

14. 318 U.S. at page 114, 63 S.Ct. at page 481.

others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act."[15]

There is nothing in Palmer v. Hoffman to impel a holding that the Act is inapplicable to hospital records in general and certainly nothing to dictate the course we took in New York Life of excluding diagnostic records while indicating approval of clinical records.[16] It is the regular business of hospitals to make both kinds of records and the one kind is no less trustworthy than the other. Most courts admit records of medical diagnosis as readily as records of medical observation.[17] The Supreme Court has counseled us to determine admissibility according to "the character of the records and their earmarks of reliability * * * acquired from their source and origin and nature of their compilation."[18] Medical diagnoses incorporated in hospital records, perhaps more than any other kind of business entry, satisfy Wigmore's "Circumstantial Guarantee of Trustworthiness * * *; for the records are made and relied upon in affairs of life and death."[19] Moreover, the cases decided before enactment of the Business Records Act treated records of diagnoses by no different test of competence than records of medical observations[20] and I can hardly believe that Congress intended by the Act to restrict the scope of admissibility, especially when such a restriction would produce a pointless result. If the doctors who made the diagnoses were in court, as Professor Wigmore points out, they could "amidst the day-to-day details of scores of hospital cases * * * ordinarily recall from actual memory few or none of the specific data entered; they themselves rely upon the record of their own action; hence, to call them to the stand would ordinarily add little or nothing to the information furnished by the record alone."[21] What would happen in such a case would be the admission of the records of the diagnoses as past recollection recorded. The public disadvantage resulting from interference with hospital operation by requiring attendance in court of the various doctors and nurses who have participated in the preparation of records is too serious a price to pay for the doubtful advantage of cross-examining a doctor who has little or no independent recollection of the subject he has reduced to writing.[22]

Apart from New York Life, it has been the view of this court that records of medical "opinions" are no less admissible than records of medical observations. In Eureka-Maryland Assur. Co. v. Gray, 1941, 74 App.D.C. 191, 121 F.2d 104, for example, although we excluded certain hospital records as violating the doctor-patient privilege, we held admissible an autopsy report which was as much "opinion" as is a diagnosis. See, also, United States v. Balance, supra note 8. I see no greater risk in admitting records of opinions, where the circumstances assure a high degree of reliability, than in admitting records of facts. We are no less concerned that facts be reported truthfully and accurately than that opinions be well qualified and not lightly formed. In the case of testimonial evidence, our concern, in both instances, is set at rest by the device of cross-examination. Under the business entries excep-

15. Id. 318 U.S. at page 113, 63 S.Ct. at page 480.

16. 79 U.S.App.D.C. at pages 72–73, 147 F.2d at pages 303–304.

17. Note, 48 Col.L.Rev. 920, 929 (1948); Note, 54 Yale L.J. 868, 874 (1945).

18. Supra note 14.

19. 6 Wigmore, Evidence (3d ed. 1940) p. 36.

20. See Notes 7 and 8, supra.

21. Supra note 19.

22. Ibid.

tion to the hearsay rule, as expressed in § 1732(a), we have accepted, in both instances, the "circumstancial probability of trustworthiness."[23]

When we held bacteriological slides admissible in Wheeler v. United States, 1953, 93 U.S.App.D.C. 159, 163–164, 211 F.2d 19, 23, certiorari denied 1954, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140, we concerned ourselves only with the self-contained limitations of § 1732(a). We said:

> "There is no doubt that these slides were made and kept in the regular course of business and that it was the hospital's regular course of business to make them."

And to illustrate the scope of § 1732(a), we cited Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1950, 183 F.2d 467, holding a report of the United States Bureau of Mines admissible under the statute on the ground that it was part of the business of the Bureau to make such reports. On the question of "opinion" records, the Third Circuit said in that case:

> "The report is no less admissible because it contains conclusions of experts which are based upon hearsay evidence as well as upon observation. These circumstances, by virtue of express statutory provisions, go to weight rather than to admissibility. Moreover, this Court has several times held that hospital records are admissible under the statute, and certainly medical diagnosis is no less a matter of opinion based upon observation and perhaps hearsay than this report of the Bureau's investigation."[24]

Another case we cited in Wheeler as admitting records "because they represent routine reflections of day-to-day operations"[25] was Gile v. Hudnutt, 1937, 279

Mich. 358, 272 N.W. 706, 707, 709. That case rejected a contention that the Michigan statute (substantially similar to § 1732(a)) authorized admission of only such hospital records as show "dates or something of that kind" and pointed out that the statute "contains its own limitaions": the record must have been made in the regular course of business and it must have been the regular course of such business to make such record. That is the test we applied in Wheeler. Applying it here also, I conclude that hospital records containing medical diagnoses are clearly admissible.

And if records of diagnoses are admissible, I see no basis for drawing a distinction between diagnoses of mental illness and diagnoses of physical illness. The Seventh Circuit in Becker v. United States, 1944, 145 F.2d 171, admitted a record containing the diagnosis "Psychoneurosis, Hysteria."[26] The Court of Appeals of New York, in People v. Kohlmeyer, 1940, 284 N.Y. 366, 31 N.E.2d 490, 491, 492, held admissible under the New York statute (similar to § 1732(a)) a hospital record containing a diagnosis of "manic depressive insanity," observing:

> "It is always competent for physicians to state their scientific opinions as to the nature of illnesses, their causes and probable results, founded upon the facts disclosed in the evidence. * * * We fail to see why the recorded conclusions of the hospital physicians on scientific matters should be deemed objectionable on any ground when they would not be objectionable were the physician whose diagnosis is contained in the record called personally to the witness stand. * * * We find no difference in a recorded diagnosis of a physical condition and of a mental condition."

---

23. 5 Wigmore, Evidence (3d ed. 1940) § 1422.

24. 183 F.2d at page 473.

25. 93 U.S.App.D.C. at page 163, 211 F.2d at page 23.

26. See, also, Pritchett v. Etheridge, 5 Cir., 1949, 172 F.2d 822, 823 (hospital records showing insured was "disoriented and irrational" admissible on issue of mental capacity to effect change in beneficiary).

There may, of course, be cases where records of diagnoses (psychiatric or physical) were prepared under such circumstances as to deprive them of reliability. Where such facts appear, either on the face of the records or through other evidence, such records would be inadmissible under the limitations of § 1732(a) and the doctrine of Palmer v. Hoffman. Where, however, we are dealing with regularly recorded psychiatric diagnoses, which would be acceptable in testimonial form, there is no reason to condemn them as more "conjectural" than ordinary medical diagnoses, or as less likely than ordinary medical diagnoses to be agreed upon by equally competent men.[27] We said in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 875:

> "The questions of fact under the test we now lay down are as capable of determination by the jury as, for example, the questions juries must determine upon a claim of total disability under a policy of insurance where the state of medical knowledge concerning the disease involved, and its effects, is obscure or in conflict."

By the same token, the jury is as competent to allow proper weight to medical opinion in the one field as in the other. For us to pick and choose among various diagnoses to determine which may go to the jury and which are so conjectural that they must first be subjected to the test of cross-examination would be to assume "an impossible role" and "one for which [we] have no special competence." 94 U.S.App.D.C. at page 238, 214 F.2d at page 872. The diagnostic terms employed in the records of mental hospitals are "abbreviations for sets of symptoms which are relatively standardized in medical literature and increasingly relied upon in practice."[28] That laymen are less familiar with the content of these terms than with the terminology of older branches of medicine should not cause us to close our eyes to useful evidence. We have gone far since the days when mental injury was considered too speculative to be compensable.[29] "In this field of law as in others, the fact finder should be free to consider all information advanced by relevant scientific disciplines."[30]

The exclusionary rule laid down in New York Life was based in part upon a distrust of the recorded statements of mental patients made in the course of examination and treatment. The court said that "accounts of selected items from interviews with patients must be subject to the * * * safeguard" of cross-examination.[31] But the revelations of the patient through conversation with the doctor constitutes a most significant part of the symptomatology of mental disease. They are as indispensable to the psychiatrist as observations of temperature and blood pressure are to the internist; indeed, they are the psychiatrist's physical observations.[32] To exclude them could be to bar

---

27. The fact that doctors can disagree about physical diagnoses has not troubled the courts. In Adler v. New York Life Ins. Co., supra note 7, 33 F.2d at pages 829, 830, for example, the records that were admitted in evidence disclosed such disagreement on their face, one doctor diagnosing the condition as "duodenal ulcer" and another as "dyspepsianerosa with possibility of duodenum ulcer." See, also, Norwood v. Great American Indemnity Co., 3 Cir., 1944, 146 F.2d 797, 830, holding admissible, under both the Federal statute (now 28 U.S.C.A. § 1732) and the Pennsylvania statute, 28 P.S.Pa. § 91b, "conflicting" autopsy reports.

28. Note, 54 Yale L.J. 868, 876 (1945), and authorities there cited.

29. See Mickelson v. Fischer, 1914, 81 Wash. 423, 429, 142 P. 1160, 1163.

30. Durham v. United States, 94 U.S.App. D.C. at pages 238–239, 214 F.2d at page 872.

31. 79 U.S.App.D.C. at page 73, 147 F.2d at page 304.

32. See Claffey v. Fenelon, 1928, 263 Mass. 427, 161 N.E. 616, 618: "Record of the treatment and medical history of an inmate of a hospital for mental diseases must of necessity to a considerable extent

from the jury the data upon which the diagnosis has been based. Psychiatrists do not, of course, record a verbatim account of everything the patient says; they record only psychiatrically significant utterances. An objection on the ground that the record contains only "selected items" implies, alternatively, that we insist upon a complete and unexpurgated version of all of the ravings of a diseased mind, or that we prefer the layman's untutored instinct over the psychiatrist's trained perception as a tool for selection. I would accept neither of these alternatives. In my view, the statements of the patient which a qualified psychiatrist deems significant as a reflection or indication of his mental and emotional state constitute necessary and proper evidence when that state is in issue.[33]

There is no substance in the fear expressed in New York Life that to construe § 1732(a) as authorizing the admission of records of patients' statements would leave "no logical escape" from admission of such undesirable hearsay as reports by newspapermen, poll-takers, statisticians and the like.[34] The "logical escape" is that, in those hypothetical situations, the events recorded are not part of the business of the recording agencies so that the records would be inadmissible under § 1732(a).[35]

A careful re-examination of the problem of admissibility of hospital records under § 1732(a) convinces me that New York Life should no longer be followed insofar as it excludes regularly kept records of recognized institutions incorporating the observations, opinions and conclusions of qualified personnel and the statements of patients to doctors made in the course of examination and treatment. In proposing thus to alter the position of this court, I am moved, *inter alia*, by the fact that our New York Life decision has been followed by some other courts, sometimes with regrettable results.[36]

### As to Point IV

The clear mandate of 18 U.S.C. § 4244 is that the adjudication of competency to stand trial, which precedes the accused's trial, "shall not be introduced in evidence on [the issue of insanity as a defense to the crime charged] nor otherwise be brought to the notice of the jury." The trial judge in this case suggested to the prosecutor that he offer the adjudication in evidence. It was offered and received and was read to the jury. This violation of the statute is reversible error.

The majority opinion recognizes that the trial court's ruling, "standing alone and stripped of its setting, was error," but it finds in the circumstances of the case a waiver by the appellant from which it concludes that the error was not prejudicial. My reading of the record shows no waiver.

Appellant offered in evidence the February 28, 1955, adjudication that he was "presently *insane and* so mentally incompetent as to be unable to understand the proceedings against him, or properly to assist in his own defense * * *." The trial judge received it, but ruled, *sua sponte*, that he would also receive "as neutralizing this order," the subsequent adjudication of competency to

be descriptive of conduct and conversations reflective of the state of mind of the patient."

33. Guttmacher and Weihofen, Psychiatry and the Law (1952) p. 279.

34. 79 U.S.App.D.C. at page 73, 147 F.2d at page 304.

35. Clainos v. United States, 1947, 82 U.S. App.D.C. 278, 280–281, 163 F.2d 593, 595–596. See Morgan, The Law of Evidence, 1941–1945, 59 Harv.L.Rev. 481, 564 (1946).

36. See Glazier v. Sprague S.S. Co., D.C. E.D.Pa.1952, 103 F.Supp. 157, 161, where, the issue being whether the plaintiff's condition was the result of cerebral thrombosis or cerebral embolism and two medical witnesses giving contradictory testimony, the court chose to credit the diagnosis of one witness and discredit that of the other, refusing, on the authority of New York Life, to consider the diagnoses of United States Naval Hospital physicians appearing in the plaintiff's hospital record.

stand trial. He added that he had considerable doubt as to whether the first order was admissible, "because it bears on a different issue" (*i. e.,* competency to stand trial, rather than sanity). There is, of course, no doubt because (1) incompetency to stand trial, though not *the same as* insanity, is *relevant* to it; and (2) the February 28, 1955, adjudication' was that appellant was *insane* as well as incompetent. My brethren of the majority now seem to assume that appellant had no right to introduce the February 28, 1955, order and they infer from that assumption that, "as a matter of trial strategy," he agreed to allow the competency adjudication to be received in evidence in consideration of being allowed to introduce the earlier order. But there is nothing in the record to support that inference. The most that appears is that defense counsel failed to object to evidence offered by the prosecution at the suggestion, if not the direction, of the trial judge. Mere failure to object is not waiver of a statutory mandate. Waiver is "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

Even if the record supported a conclusion that appellant had waived the violation of § 4244, I would hold that the admission of the competency adjudication was reversible error. I do not think the accused can raise or lower this statutory bar at his will.

Society has as much interest as the accused in having the issue of criminal responsibility resolved in accordance with those procedures which, in the judgment of Congress, are most likely to produce the correct result. Congress did not provide that the accused should have a privilege against introduction of the order, or that the order should be admissible if not objected to—it provided in unambiguous terms that the order "should not be introduced in evidence * * * nor otherwise be brought to the notice of the jury."[37] I think this situation is in this respect not unlike Hopt v. People of Territory of Utah, 1884, 110 U.S. 574, 579, 4 S.Ct. 202, 203, 28 L.Ed. 262, where the Court held that a provision of a state statute, Cr. Code Proc. § 218, that "the defendant must be personally present at the trial" established a non-waivable requirement. Mr. Justice Harlan, for a unanimous Court, said:

"We are of opinion that it was not within the power of the accused or his counsel to dispense with statutory requirement as to his personal presence at the trial. The argument to the contrary necessarily proceeds upon the ground that he alone is concerned as to the mode by which he may be deprived of his life or liberty, and that the chief object of the prosecution is to punish him for the crime charged. But this is a mistaken view as well of the relations which the accused holds to the public as of the end of human punishment. The natural life, says Blackstone, 'cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow creatures, merely upon their own authority.' 1 Bl.Com. 133. The public has an interest in his life and liberty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with, or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods. * * * *"

The majority opinion bases the waivability of the statutory proscription in large part upon the view that the competency report really benefits the accused. The theory seems to be that it is obvious to the jury that the accused is competent to stand trial, so that in-

37. See United States v. Everett, D.C.D.Kan.1946, 146 F.Supp. 54, 56.

troducing the competency adjudication really focuses attention upon the fact that he was previously incompetent. A somewhat similar theory was advanced by the Government in Bruno v. United States, 1939, 308 U.S. 287, 60 S.Ct. 198, 201, 84 L.Ed. 257. The question there was whether, under a statute * providing that the defendant's failure to testify "shall not create any presumption against him," the defendant had a right to an instruction that the jury was to disregard his failure to take the stand. The Government argued that the defendant would be better off without the instruction because the jury might not have noticed his failure to testify and the instruction would bring it to their attention. Rejecting this argument, Mr. Justice Frankfurter said, 308 U.S. at page 294, 60 S.Ct. at page 200:

> "To the suggestion that it benefits a defendant who fails to take the stand not to have the attention of the jury directed to that fact, it suffices to say that, however difficult it may be to exercise enlightened self-interest, the accused should be allowed to make his own choice when an Act of Congress authorizes him to choose.[38] And when it is urged that it is a psychological impossibility not to have a presumption arise in the minds of jurors against an accused who fails to testify, the short answer is that Congress legislated on a contrary assumption and not without support in experience. It was for Congress to decide whether what it deemed legally significant was psychologically futile."

* Now 18 U.S.C.A. § 3481.

38. The right involved in Bruno was not, like that here in issue, covered by a specific statutory mandate. The statute there did not provide that "the court *shall instruct* the jury, etc." There was

FAHY, Circuit Judge (dissenting).

I concur in Part I of the opinion of Judge Prettyman.

I also concur in that portion of Part II of his opinion which concludes it is error for the trial judge, in advising the jury of the consequence of an acquittal by reason of insanity, to submit to the jury the question of probable release of the accused at some future date or to submit evidence to them on that point. But I think the error in the present case in this respect was not harmless and is ground for reversal.

As to Part III I think the record of the United States Hospital for Defective Delinquents, indicating appellant was suffering from schizophrenia when confined there some years before the alleged crime, was sufficiently trustworthy in the circumstances of this case to be admissible on the defense of insanity. See United States v. Balance, 61 App.D.C. 226, 59 F.2d 1040. I so conclude even though the record be not considered a "record of any act, transaction, occurrence, or event," within the meaning of the Federal Business Records Act, 28 U.S.C. § 1732 (1952). It appears to have been made as a matter of routine by disinterested Government doctors. It follows that in my view New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297, does not control.

As to Part IV I dissent. As to this aspect of the case I agree with the analysis and conclusion of Judge Bazelon's dissent.

> thus room for argument as to waivability of the right. Since the defendant requested the instruction, however, waivability was not in issue and was not decided.